**Frank Jimmy SNIDER, Jr., Petitioner**

v.

**W. Frank SMYTH, Jr., Superintendent of The Virginia State Penitentiary, Respondent.**

**No. 574.**

United States District Court
E. D. Virginia,
Newport News Division.

Sept. 27, 1960.

T. Warren Messick, Roanoke, Va., for petitioner.

A. S. Harrison, Jr., Atty. Gen. of Virginia, C. F. Hicks, Special Assistant to Atty. Gen. of Virginia, Gloucester, Va., for respondent.

WALTER E. HOFFMAN, District Judge.

On July 21, 1958, this Court filed a memorandum opinion discharging the writ of habeas corpus, dismissing the ·petition, and remanding petitioner to the custody of respondent for further pro-

ceedings. Petitioner is under a sentence of death for statutory rape of a nine year old child, pursuant to an order of the Hustings Court for the City of Roanoke, Virginia, originally imposed on June 27, 1956.

An appeal followed this Court's action and, on January 23, 1959, the United States Court of Appeals for the Fourth Circuit remanded the case to the District Court "for further proceedings to ascertain, in cooperation with the Commonwealth of Virginia, the petitioner's mental condition at the time of the offense charged and, if possible, now." The Court of Appeals did not, in fact, reverse the action of the District Court, but merely concluded that the mental condition of petitioner had not been sufficiently explored, despite the opportunity afforded petitioner in his habeas corpus hearing. Snider v. Smyth, 4 Cir., 263 F.2d 372.

On April 3, 1959, in cooperation with the authorities of the Commonwealth of Virginia, petitioner was transferred from the State Penitentiary to Southwestern State Hospital, Marion, Virginia, for observation and study in an institution devoted to the criminally insane. In July the authorities at Southwestern reported that petitioner was not psychotic when the crime was committed on May 13, 1956; nor at the time of his trial on June 25, 26, 27; nor during his stay at Southwestern. The diagnosis was "Sociopathic Personality Disturbance, Antisocial Reaction (sexual assault)." On August 27, 1959, an agreed order was entered permitting petitioner to be examined by not more than two privately employed psychiatrists. Petitioner was thereafter examined by Dr. John O. Hurt. On November 30, 1959, the further hearing in this matter was conducted at Richmond, Virginia, with petitioner being present in person, at which time the Court heard the testimony of Dr.

Hurt, Dr. Charles A. Zeller, and Dr. Joseph R. Blalock, the latter two physicians being the Clinical Director and Superintendent, respectively, of Southwestern State Hospital.

There is little that need be added to the prior memorandum from a factual standpoint. Having examined the trial proceedings now in evidence for the first time, we find that petitioner's sole defense was the establishment of an alibi—he denied any implication in the crime. While it is not the function of this Court to review the facts, it is abundantly clear that the evidence justified the finding of guilt. The sordid details of the crime call for only one punishment, if the petitioner was mentally capable of committing the act [1].

From the statements of counsel we learn that petitioner is wanted by the authorities in Baltimore, Maryland, for a similar act alleged to have been committed a few days prior to May 13, 1956. At the time of his trial, petitioner, who elected not to testify at either of the habeas corpus hearings, stated that he returned to Roanoke on May 11, 1956. In company with a nurse he drove to Martinsville on May 12 and, after spending the night there, commenced his return trip to Roanoke at approximately 12:45 p. m. When reaching a point just outside the city limits of Roanoke, petitioner stopped his car, and left his nurse-companion asleep therein while he became engaged in sexual relations with another woman. Counsel state that there were charges filed against petitioner for this act, but, according to a statement made by petitioner to the police and to physicians, the woman consented to the act but became resentful when petitioner declined to pay her the sum of $5. Petitioner started to return to his automobile, but saw his nurse-companion pulling away, and he thereafter hitchhiked to her apartment.

1. Counsel for petitioner urge that this Court has the power to order a new trial or, in the alternative, a reduction in sentence if, in the opinion of the Court the petitioner, while mentally competent, was nevertheless afflicted with an incurable sexual urge which prompted petitioner's criminal acts. This is a matter for consideration by the executive branch of the state government.

A matter of minutes before the attack upon the young child, there is evidence that petitioner, while in a populated area in Roanoke, exposed a portion of his person to a young girl. Petitioner denied this act at the time of trial, but his counsel now rely upon same as a suggestion of his mental condition. Thereafter, petitioner took the nine year old child from an alley near her home, forced her into his automobile, required her to commit an act within the Virginia statute defining sodomy, Code 1950, § 18–98, while driving his car a few miles, and subsequently forcibly raped the child on several occasions. After about one hour, petitioner returned the child to the vicinity of her home where she was found in such a condition that she required hospital treatment for a period of three days [2].

Such acts are not normal, but we are not here to inquire into the question of what may be "normal" under the circumstances. The defense of lack of mental capacity was never raised in the state court. It was, however, interposed in habeas corpus proceedings instituted in the state court, as well as in this court.

From the testimony of the three qualified psychiatrists, it appears that petitioner has an irresistible sex *urge* which he is, at times, unable to control. The medical testimony does not *per se* place petitioner in the category of acting under an *irresistible impulse*. There were no illusions or hallucinations and petitioner was never away from reality. He had no neurological findings of any head injury. He clearly knew the difference between right and wrong. In summary, it seems that petitioner is capable of planning his sexual acts; that he is capable of controlling his sexual plans and activities up to a point, but apparently has no desire to exercise such control; that when he reaches a secluded place where there is little likelihood of intervention, he then is no longer able to control his actions when he has his victim under his complete control.

■ The petitioner was not, and is not, psychotic. He was able to comprehend the nature of his act and knew what he was doing. That he has a strong antisocial personality and is blunted morally and ethically affords no legal defense for his atrocious crime.

■ While Virginia recognizes irresistible impulse as an affirmative defense to legal responsibility for the commission of a crime, it does not follow that an uncontrollable or irresistible urge is identical. An irresistible impulse cannot be considered as the product of a planned act; it comes upon a person rather hurriedly; it rises quickly; short of interference by a third party, it is irresistible. The term "irresistible impulse" as used in criminal law means an impulse to commit an unlawful or criminal act which cannot be resisted or overcome because insanity or mental disease has destroyed the freedom of will, the power of self-control, and the choice of his actions. While the words "irresistible" and "uncontrollable" are perhaps synonymous, the words "impulse" and "urge" do not necessarily carry with them the same idea. A continuing impulse toward some activity or goal may be the result of an "uncontrollable urge", but it falls short of requiring the action so essential in cases of "irresistible impulse". A person with an "uncontrollable urge" may still retain the power of self-control with respect to the choice of his actions, at least to the point of planning his actions. In short, the "urge" does not command action, whereas the "impulse" is the action itself.

■ Assuming arguendo that petitioner, having control over his proposed victim in a secluded area where he is able to fulfil his sexual desires, is then no

2. According to petitioner's statement to Dr. Zeller, he has been involved in seven or more criminal assaults upon women in Maryland, some of which have been forcible acts. Petitioner was twice convicted as an exhibitionist in Michigan several years prior to the commission of the crime for which he stands convicted.

longer able to withhold the commission of his criminal act, this is not sufficient in law to establish an irresistible impulse or temporary insanity when the criminal act is planned in advance of this moment.

Counsel for petitioner place great stress upon the report of a committee designated by the Group for the Advancement of Psychiatry in which the rule is laid down that, with respect to sexual crimes, where the elements of repetitive compulsive acts, the use of force, and age disparity, all exist, the individual is mentally ill and should be placed in an institution for treatment instead of taking his life. Much can be said for this argument in the legislative and executive branches of our government, but the judiciary should not usurp the proper function of our other branches in dealing with the ultimate disposition of aggravated sex offenders in the several states, unless it be shown that the accused committed his act while temporarily or permanently insane, under circumstances wherein his freedom of will, power of self-control, and choice of action either never existed or had been destroyed.

Petitioner at all times had the substantial capacity to understand or appreciate his criminal conduct. If he has or had any mental disease or mental defect, it is not one which substantially affected his capacity to appreciate that he was committing a criminal act. Giving petitioner the benefit of the doubt and encroaching to some extent on the "right and wrong" test, it is incumbent upon petitioner to establish, at the very least, that he had a disease of the mind which brought about a substantial impairment of capacity to understand or appreciate his criminal conduct.

It is suggested by the evidence that petitioner's personality disturbance is incurable. Agreeing with this viewpoint, it does not follow that every individual with an extreme personality disturbance is mentally incompetent in a legal sense. His sexual urge is uncontrollable in that he cannot suppress the same to keep these urges from erupting, but, at the same time, he has control over his will power and is able to arrange some means of sexual satisfaction which will avoid criminal activity. Basically the urge for sexual satisfaction on the part of petitioner differs from that of the average man only in degree, although he has been classified as an exhibitionist which, to petitioner, is partial pleasure and partial satisfaction. Indeed it is fair to state that, from the testimony, the word "uncontrollable" has, to some extent, been used interchangeably with the word "incurable". The evidence is clear that petitioner's condition is "incurable" and in this sense cannot be "controlled", but a fair conclusion from the remarks of the experts would not suggest that petitioner was unable to control his actions prompted by his incurable urge.

We need not become involved in any extended discussion of the M'Naghten and Durham rules. The M'Naghten case, 8 Eng.Rep. 718, established as early as 1843 the "right and wrong" test of criminal responsibility. In Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, the District of Columbia Court of Appeals held that neither the "right-wrong" test nor the "irresistible impulse" test were adequate as these tests gave no recognition to mental illness characterized by brooding and reflection, and did not take sufficient account of psychic realities and scientific knowledge. In effect, the Durham rule is that an accused is not criminally responsible if his unlawful act is the product of mental disease or mental defect. The Durham rule has been frequently criticized and sometimes supported, but it is apparent that Virginia has never adopted this so-called broader view of criminal responsibility.[3]

Virginia has not adhered strictly to the "right-wrong" test, but has recognized

---

3. See comments of Chief Judge Sobeloff on "Insanity and the Criminal Law: From M'Naghten to Durham, and Beyond". **41** Am.Bar Assoc. Journal 793.

304

the "irresistible impulse" doctrine for many years. As recently as Thompson v. Commonwealth, 193 Va. 704, 718, 70 S.E.2d 284, 291, the Supreme Court of Appeals of Virginia established the following definition:

> "Irresistible impulse is defined to be 'an impulse induced by, and growing out of some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity.'"

It is well settled that, in Virginia, the burden rests upon the accused to prove his mental incompetency. Wessells v. Commonwealth, 164 Va. 664, 180 S.E. 419; Dejarnette v. Commonwealth, 75 Va. 867. Moreover, the United States Supreme Court has declined to interfere with a state's policy on the issue of insanity and has further stated that the adoption of the irresistible impulse test is not "implicit in the concept of ordered liberty". Leland v. State of Oregon, 343 U.S. 790, 798, 800, 801, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302.

In conclusion, it may be said that petitioner has failed to meet the burden imposed upon him, according to Virginia law, that he was acting under an irresistible impulse in committing the crime of rape upon the nine year old child. That his acts, conduct, and mental responses may characterize him in the "fringe area" which, according to some psychiatrists, may be considered a "disease of the mind" depends upon the philosophy of the individual making the appraisal. It is conceded that he knew the difference between right and wrong, and

that he was at all times mentally competent to assist in his defense. His only further recourse, assuming an affirmance of this decision on appeal, is to resort to executive clemency. The writ is again discharged and the petition is again dismissed.