# Richmond

EUGENE WILLIAM ROLLINS v. COMMONWEALTH OF VIRGINIA.

November 28, 1966.

Record No. 6260.

Present, All the Justices.

*Harry P. Friedlander* (*Friedlander and Friedlander*, on brief), for the plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General* (*Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

A grand jury of Arlington county returned an indictment against the defendant, Eugene William Rollins, charging him with the murder of Leon Tatleman. He entered a plea of not guilty. After hearing the evidence, a jury found him guilty of murder in the first degree and fixed his punishment at life imprisonment. He was sentenced accordingly and we granted a writ of error to consider his contentions that there were prejudical errors in his trial. He will be herein referred to as defendant or Rollins.

On his plea of not guilty defendant offered no evidence in denial

of the charge that he killed Tatleman. His defense was that he was not guilty by reason of insanity. The evidence introduced by the Commonwealth was to the following effect:

Edwin Welch and defendant lived in the same neighborhood when they were boys ten or eleven years old. In April, 1963, they met in a restaurant in Arlington and recognized each other. In a few days defendant moved into Welch's apartment and stayed there four or five weeks. During that time he appeared to be normal and Welch saw nothing unusual about him.

In the evening of May 10, 1963, Welch, Tatleman, Rollins, Robert Miller and Margaret Klassett gathered in a restaurant where Welch was to deliver to Tatleman approximately $1500 that Tatleman had won on a horse race. These five there had dinner and drinks and in the course of the evening Welch gave the $1500 to Tatleman in the presence of the defendant. Miller, who had known Rollins for about twenty months, had told Rollins earlier that evening of the plan and purpose of meeting in the restaurant.

The party in the restaurant broke up around 12:30 a.m. and all went in Tatleman's car to Welch's apartment, where Welch, Miller and Klassett got out. Welch went to his apartment and brought back a letter for Rollins, and on his return to the car he heard Tatleman say to Rollins that he would take him where he wanted to go. Tatleman then drove off with Rollins in the back seat. When Welch returned to his apartment he found some of his personal effects missing and Rollins' clothing gone.

About six hours later, around 6 a.m. of the same morning, May 11, 1963, Tatleman's body was found in the front seat of his automobile, dead from a gunshot wound in his head from a .38 caliber bullet which had entered near his right temple and was lodged under the skin near his left ear. The only money found on his body was about $17 in his coat pocket.

Rollins was arrested by agents of the Federal Bureau of Investigation about 1:30 p.m. on Monday, May 13, 1963, in the Bronx, New York. He then had $980 on his person. He told the agents that he had won $1800 in a numbers game and had given his wife about $140.

It was proved that the bullet in Tatleman's head was fired from a pistol owned by Rollins. The pistol was found under a bush in the yard of a library in York, Pennsylvania. Rollins had occupied a room in a hotel there on the night of May 11, and after his arrest a

suit of clothes belonging to Welch was found under an extra blanket in the bottom drawer of the dresser in the room.

The evidence left no doubt that Rollins fired the shot that killed Tatleman.

At the conclusion of the Commonwealth's evidence the defendant introduced his only witness, Dr. Robert H. Robertson, a psychiatrist on the staff of St. Elizabeth's Hospital in Washington. Dr. Robertson testified that Rollins had been committed to the hospital on September 26, 1956,[1] and he first met him on November 21, 1962. He had five written notes of his examinations of Rollins, had also examined him at other times and conferred with other doctors about him. He had, he said, the complete record of his hospitalization dating back to 1956. His first note of examination, he stated, was written on November 26, 1962, and it was his opinion that at that time Rollins "suffered from schizophrenic reaction, paranoid type."

Dr. Robertson described that as being a major mental illness consisting of three major symptoms: withdrawal, loosening of his associations, and feelings not expressed normally. In addition, he said, Rollins had normal mental faculties, was clear as to what was going on around him, but had hallucinations, including delusions of persecution and grandeur.

Dr. Robertson testified that in 1962 it was the decision of the doctors and authorities at the hospital that Rollins was competent to stand trial, and that he was then sent back to jail and stood trial. The doctor then read into the record a report which he said was dated April 1, 1962,[2] that Rollins was mentally competent for trial and that "he was suffering from mental disease on or about April 20, 1956, and the criminal acts with which he is charged * * if committed by him, were the product of mental disease." The report stated also that "the patient feels that he understands the nature and character of his charges and is capable of assisting his counsel in his defense."

After Tatleman was killed, Rollins was, on July 1, 1963, committed to the Southwestern State Hospital at Marion, Virginia, for care and observation pursuant to Code § 19.1-228. He remained there for nearly nine months and was then returned to the court for trial with

(1) Rollins states in his brief that he was sent there for observation after being indicted in the District of Columbia for housebreaking and robbery. The Commonwealth's brief states that he was committed by a court order. There is no evidence in the record on this point.

(2) There is a confusion of dates not explained in the record.

the official diagnosis of "Sociopathic Personality Disturbance, Antisocial reaction."

In rebuttal of defendant's contention that he was not responsible for the death of Tatleman because of insanity, the Commonwealth introduced the evidence of Arthur Centor, chief psychologist of Southwestern State Hospital; Joseph R. Blalock, M.D., psychiatrist and superintendent of Southwestern, and Zygmund Wegielski, M.D., psychiatrist and clinical director of maximum security division in Southwestern. These three were questioned at length as to their training and experience, as to their observations, examinations and tests of the defendant, and their findings as to his mental condition. They testified, in substance, that Rollins had a character disorder in the nature of emotional instability, hostility and resentment against authority, described as "sociopathic personality disorder, antisocial reaction." They found, they said, no evidence of schizophrenic reaction, paranoid type, and there was nothing to indicate the presence of a psychosis and no indication that he did not know the difference between right and wrong and the consequences of his act.

Also, Dr. Maurice Platkin, a specialist in psychiatry and on the staff of St. Elizabeth's Hospital, testified that Rollins was under his supervision from 1957 until April or May, 1962, and the diagnosis of his trouble was schizophrenic reaction, paranoid type, but he was of the opinion that Rollins "was fully aware of the difference between right and wrong," and the consequences of his act; and that his mental condition and attitude improved during that period.

Also, Francis R. Riesenman, M.D., who was staff psychiatrist at St. Elizabeth's from 1947 to 1962, and afterwards examined Rollins a total of nine times, in March and April, 1964, testified that Rollins was suffering from a "sociopathic personality disturbance or disorder, with paranoid features." His opinion was that on May 11, 1963, Rollins knew the difference between right and wrong and was able "to adhere at that time to the right," and that would be true, he said, even if he were in fact a paranoid schizophrenic at that time.

In addition, those who were at the party in the restaurant on the night of the killing, and who had known and associated with Rollins over a period of weeks or months, testified that he seemed rational and normal, and they observed nothing to indicate that he suffered from any mental illness.

The evidence was ample to warrant rejection by the jury of defendant's insanity defense.

██ Defendant contends, however, that prejudicial errors were committed in his trial in the particulars now to be discussed.

Defendant says the court erred in adding to an instruction defining "irresistible impulse" this sentence: "In this respect, the jury is instructed that if the act which is alleged to be the result of an irresistible impulse was planned in advance, then, as a matter of law, such act cannot be said to be the product of an irresistible impulse."

There was no error in so instructing. The word "impulse" implies that which is sudden, spontaneous, unpremeditated. Webster's 3d New Int. Dict., p. 1138. The witness Centor was asked, "Could you have an irresistible impulse and then plan to carry out that impulse?" He replied, "It is inconceivable." He further stated that an irresistible impulse is one that involves no planning, "it could occur at any place in the presence of anyone, no attempt at concealment would be made." Cf. *Christian* v. *Commonwealth*, 202 Va. 311, 315, 117 S.E.2d 72, 75; *Snider* v. *Smyth*, 187 F. Supp. 299, 302, affirmed in *Snider* v. *Cunningham* (4 Cir.), 292 F.2d 683; Annotations, 70 A.L.R. 659, 173 A.L.R. 391.

Additionally, there is no suggestion in the evidence that the defendant acted on an irresistible impulse. On the contrary, Dr. Platkin testified he did not recall any incident while Rollins was in the hospital or any history that would have suggested an irresistible impulse.

██ Next, defendant asserts that the witness Centor, a psychologist, should not have been allowed to express an opinion as to the mental condition of the defendant. That opinion was that the defendant was not, at the time of his examination, mentally ill; that no signs remained of any previous mental illness, and that apparently defendant had a sociopathic personality disturbance, anti-social reaction, a term applicable to those "who engage in acts that are against the commonly accepted code of society." It is observed that Dr. Blalock, Dr. Wegielski and Dr. Riesenman, all psychiatrists, testified to the same opinion.

The record shows that Centor had been chief psychologist for eight and one-half years, with a total practical experience of more than eleven years. He held degrees of Bachelor of Science and Master of Science in psychology, and had completed all requirements for a Ph.D. degree and was soon to receive that degree, his thesis therefor being on the subject of "Prognosis in schizophrenia." He had testified in Virginia courts as an expert witness some forty times. The staff conference at Southwestern Hospital, which passes on the diagnosis

of all criminal cases there, consisted of Centor, the superintendent and the clinical director, and Centor's opinion was part of the final diagnosis. In the past eleven years his opinion had been a part of the final diagnosis in almost two thousand cases. He is a clinical psychologist, he said, who "is one who deals with the same type of material that psychiatrists would."

Centor said he interviewed and examined defendant individually five different times, and he described in detail the numerous tests he had made, one lasting two hours and ten minutes. Centor's testimony occupies forty pages in the printed record and indicates a broad knowledge of the defendant and his history. His training, experience, information and personal observation of the defendant qualified him to express an opinion as to the defendant's mental condition and constituted admissible evidence for the consideration of the jury.

We agree with the statement in *Jenkins v. United States*, (U.S. App.D.C.), 307 F.2d 637, 645, that: "The determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. * *" See also 20 Am. Jur., Evidence, § 783, p. 656, and discussion of the subject in *State v. Padilla*, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908 and Annotation thereto at 919. In the latter it is said at pp. 920, 921: "It appears, however, that the use of the psychologist in present society is growing and with this will come an increasing tendency to call him as an expert witness on the question of mental condition or competency. * *"

The court below instructed the jury that "every person is presumed to be sane and to possess a sufficient degree of reason to be responsible for his crimes until the contrary is proven to the satisfaction of the jury." Defendant asserts that this established rule was not applicable in this case because the defendant had previously been adjudged insane in another jurisdiction. The basis for the contention is that after the defendant was found to be improved by the St. Elizabeth's Hospital authorities, and sent back to the District Court, he was there tried on June 19, 1962, was found not guilty of the charges then against him by reason of insanity, and recommitted to St. Elizabeth's. It is so stated in a letter of February 28, 1964, from the Southwestern State Hospital authorities to the court, reporting that the defendant was then not insane or psychotic. It is not otherwise in the evidence. It does appear in the evidence that on March 31,

1963, defendant escaped from St. Elizabeth's, or "did not return from 9 p.m. ground privileges."

In *Thompson* v. *Commonwealth*, 193 Va. 704, 711, 70 S.E.2d 284, 288, we said:

"When the Commonwealth establishes the *corpus delicti* and that the act was committed by the accused, its case is complete. If the accused relies on the defense of insanity, the burden is on him to prove to the satisfaction of the jury that he was insane at the time. * *"

In *Christian* v. *Commonwealth, supra*, 202 Va. at 316, 117 S.E.2d at 75, we said:

"There is a presumption of law that every person charged with a crime was sane and responsible when the act was committed. * *"

The defendant failed to carry the burden of showing he was insane when the crime was committed and there was no error in the instruction complained of. Defendant cites *Setliff* v. *Commonwealth*, 162 Va. 805, 173 S.E. 517, where it was stated that if the evidence shows that the insanity for which the defendant was committed was of a permanent nature, it is generally held that the burden of proof shifts to the prosecution to establish the sanity of the accused at the time the crime was committed, but depending on the facts and circumstances of each particular case. See also 22A C.J.S., Criminal Law, § 584, p. 345. There is no proof in this record that the defendant suffered from insanity of a permanent nature. The evidence was to the contrary.

Defendant's next contention is that the court erred in refusing to admit two batches of St. Elizabeth's hospital records. They contained an assortment of letters, newspaper clippings, photographs and memoranda of various kinds by various people. Defendant now says the jury were entitled to see these records to determine for themselves whether their contents had been correctly stated. They were not admissible for any purpose.

Further, says the defendant, the court erred in striking out part of his Instruction No. 30. The first sentence of the instruction told the jury, in accord with Code § 19.1-239, that if they acquitted the defendant on the ground of insanity they should so state in their verdict. That part of the instruction was given, but the court struck out the next sentence which would have told the jury that if they so found "the Court shall thereupon, if it deems his discharge dangerous to the public peace or safety, order him to be committed to the proper State hospital for the insane to be confined there under special

observation and custody until the superintendent of that hospital and the superintendent of any other State hospital shall pronounce him sane and safe to be at large." The quoted language was also at the time of the trial part of § 19.1-239, but the direction there was to the court and was not the concern of the jury. It was properly omitted from the instruction.

■ Finally, defendant says an unlawful search was made of his motel room where incriminating evidence was found. This consisted of five pistol cartridges, identification papers, bills from the hotel in York, Pennsylvania, and a ticket to the parking lot there. The evidence shows without contradiction that this search was made with the full consent of the defendant. When defendant was arrested in New York he was taken to the office of the Federal Bureau of Investigation, and there he signed a writing which appears in the record and which states that after being informed of his right to refuse to allow the search to be made without a search warrant, the defendant thereby authorized Francis A. Torpey and William J. Fleming, agents of the F.B.I., to conduct a complete search of his motel room, at the given address, and to take therefrom any papers, material or other property they desired. The writing states: "This written permission is being given by me to the above Special Agents voluntarily and without threats or promises of any kind."

The search was conducted by Agent Beardsley, who testified that there were five other F.B.I. agents with him. When they arrived they found Richard Taltavault and Barbara Roberts, companions of defendant, entering the room, and they also gave consent to the search. Defendant argues that this was an illegal search because permission was given to Agents Torpey and Fleming and they did not make the search. The evidence does not show specifically that these two agents were among the five others referred to by Beardsley, but that is not sufficient to invalidate the permission given by Rollins and repeated by the other two occupants of the room. Cf. *Rees* v. *Commonwealth*, 203 Va. 850, 862, 127 S.E.2d 406, 415; *Drummond* v. *United States*, (8 Cir.), 350 F.2d 983.

This case was well and fairly tried in the court below, the evidence fully established the guilt of the defendant, we discern no errors prejudicial to his rights, and the judgment appealed from is therefore

*Affirmed.*