## Richmond

JEFFREY THEODORE KITZE

v.

COMMONWEALTH OF VIRGINIA

No. 0671-91-2

Decided October 13, 1992

COUNSEL

William H. Shewmake (Malcolm P. McConnell, III; Coates & Davenport, on brief), for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**ELDER, J.**—Following a trial on July 9, 1990, a jury found Jeffrey Theodore Kitze guilty of rape and malicious wounding. On appeal, he asserts (1) that the trial court erred in overruling his objections to the Commonwealth's statement in its closing argument that, if the jury found him not guilty by reason of insanity, he would go free; (2) that the trial court erred in granting an instruction that indicated to the jury that no action or movement that was planned could result from an irresistible impulse; and (3) that the trial court erred in allowing the Commonwealth to introduce hearsay statements made by an individual not called at trial. We affirm the convictions.

Appellant traveled to Charlottesville, Virginia, on May 20, 1989, in order to attend his sister's graduation from law school. His sister shared a house with three other women graduating that weekend, and appellant spent the night in his sister's bedroom. The following morning, appellant met the victim, one of his sister's housemates, for the first time. The two met twice again that day, but only briefly.

On the morning of May 22, 1989, the day after graduation, appellant and his sister packed their respective cars for the return trip home

and, by 9:00 a.m., his sister had driven away. Appellant testified that he too left the house at this time, but stopped a half mile away, turned around, and returned. He stated that, as he drove away, he started to feel as though he were "possessed or in a rage or having a seizure or something." "I just felt like—I felt like doing something like hurting [her], I guess hurting that girl, I didn't really know her name." He parked back at the house and searched in his trunk for "something to hurt the girl with."

Once inside the house, he knocked on the victim's bedroom door and, speaking through the closed door, asked if she had seen his car keys. She called back that she had not and then went into her bathroom to dry her hair.

Appellant testified that, while all of this was going on, he was "trying to fight it." He could not believe what he was thinking about doing and did not "want to do this," did not "want to hurt the girl," did not "want to do anything." "I just wanted to let the girl know I was there so maybe she could stop me from doing something to her, so I—I made up a story about had she seen my keys." He sat in the living room of the house "trying to fight . . . this feeling."

The victim stood in her bathroom drying her hair when appellant suddenly seized her by the hair, pulled her down onto the bedroom floor, and struck her several times on the back of the head with a tire iron. She screamed, and appellant instructed her to "shut up," then closed the bedroom window. Appellant struck her repeatedly as she struggled to escape. Ordering her to remove her pants and underpants, he removed his own shorts to reveal that he was wearing a jockstrap. He removed the jockstrap, lay on top of her, and forced her to have intercourse with him. He later recalled feeling a "rage, like I just wanted to hurt—hurt the girl and I just couldn't stop myself."

After raping her, appellant ordered the victim to put her pants and underpants back on, then to kneel down and lean over. When she did so, he began striking her in the back of the head with the tire iron. With his last blow, she collapsed to the floor. She lay there for several minutes, never quite losing consciousness. When she was able to get up, she saw that appellant was busy cleaning the room. He washed his hands, used a towel from the bathroom to wipe up blood and wipe off doorknobs, went to the kitchen to find paper towels, and ordered her to change her bloodied t-shirt.

Appellant seemed to calm down as he cleaned, and the victim asked him why he had done this to her. He answered that he was frustrated. She talked to him as he cleaned, as he calmed down, trying to convince him to leave. She told him that she would not tell anyone what had happened and that she would not call the police. Appellant got into his car and drove away. When he had gone, she called a friend who took her to a hospital. Her head wounds required fourteen stitches.

Recalling his thoughts just before leaving the house, appellant testified that he just did not understand what had happened to him: "I don't know why—there was something wrong with me." He wanted to see a doctor but, not knowing any in Charlottesville, headed back to Rochester. On his way home, he met his sister by chance on the highway and the two stopped at a McDonald's in Pennsylvania. He kept silent about the rape because, he said, he did not want to upset her. Somewhere along the way back to Rochester, appellant discarded his bloodstained t-shirt.

In Rochester, appellant consulted a lawyer before contacting a doctor. According to appellant, he and the lawyer "made up a little story" that the victim had been walking naked in the house when she offered to have sex with him. However, after consensual intercourse, she attacked him, scratched him, and announced that she would say appellant had raped her. Angered, appellant struck her in the head with a tire iron. Appellant stated that the purpose of this fabrication was to induce his parents to pay his legal fees.

At trial, appellant relied on the defense of insanity due to an irresistible impulse. Dr. Robert O. Brown, Sr., a psychiatrist, testified that, at the time of the rape, appellant suffered from "organic mental syndrome" or "organic personality syndrome," a mental illness related to previous brain injuries. Dr. Brown concluded that, at the time of the rape, appellant experienced an irresistible impulse over which he had no control.

During the summer of 1982, while appellant was enrolled at the Rochester Institute of Technology, he had a serious bicycling accident in which he suffered severe head injuries, including a fractured skull and a broken jaw. For five days following the accident, brain fluid leaked into his inner ear, indicating that the thickest covering of his brain had been torn. As a result of the accident, appellant eventually left school and went to work for a large corporation.

A reported second consequence of the accident was that appellant experienced difficulty relating to others. His comments tended to be socially inappropriate and his attitude argumentative and angry. At times he would "go into a wild tirade or rages over some almost insignificant item." He was also plagued with constant and "excruciating headaches."

In 1986, appellant voluntarily admitted himself to the neuropsychiatry unit of a Rochester hospital following an incident with his girlfriend in a bar during which he felt he had not maintained appropriate control over his behavior.

In 1987, appellant suffered a second serious head injury when a security guard struck him repeatedly in the head with a nightstick. According to appellant's own testimony, neighbors had hired the security guard to attack and try to kidnap him. As a result of the beating, appellant developed a large swelling on his head and suffered headaches.

Dr. Brown testified that appellant's impulse became irresistible when he went into the victim's bedroom and grabbed her. Dr. Brown acknowledged that the acts of turning his car around, driving it back to the house, stopping the car, looking for a weapon in the trunk, walking into the house, calling through the closed bedroom door, and waiting in the living room before breaking into the bedroom to beat and rape the victim involved conscious physical actions. Dr. Brown also stated that appellant's feelings of being "possessed" and his desire to harm the victim did not amount to an irresistible impulse because appellant in fact resisted them for as much as fifteen minutes.

Dr. Brown testified that the source of the irresistible impulse was a desire to punish his sister for her success. Dr. Brown stated that the weekend of the sister's graduation, in light of the history of her academic successes, and measured against his own academic failures following his head injuries, was extremely stressful for appellant. Dr. Brown indicated that stress is difficult for a brain-injured person such as appellant to manage and that the weekend graduation proved to be too much to handle.

Over objection, the Commonwealth questioned Dr. Brown about a letter he had received from the lawyer appellant consulted in New York. Dr. Brown testified that the lawyer indicated that appellant initially told him the victim had consented. Appellant objected on

grounds that "there is no foundation for any statement" to the attorney and that Dr. Brown had not used the information in the letter "as part of his conclusion that he has reached in this case." The Commonwealth argued that its questions were meant to determine what part the letter played in Dr. Brown's evaluation and whether appellant had told Dr. Brown the truth during the evaluation. The court overruled defense objections.

Dr. S. Kenneth Hoge, testifying as an expert for the Commonwealth, indicated his belief that appellant had not suffered from an irresistible impulse. Dr. Hoge testified that, while the 1982 head injury could have exacerbated appellant's personality problems, problems arising from his post-accident behavior were similar to pre-accident problems.

In its closing argument, the Commonwealth argued that the jury had a duty to protect the public and that a verdict of not guilty by reason of insanity would mean appellant would go free. The trial court overruled an objection by appellant's counsel on the ground that the latter assertion was not true. Appellant's counsel asked the court to instruct the jury on what would happen to appellant following a verdict of not guilty by reason of insanity. The trial court stated that it would "instruct this jury on that very question." When the trial court instructed the jury members on this question, it said that they "should not concern themselves with what happens after the verdict." Appellant's motion for a mistrial was denied.

The trial court also instructed the jury that, if it found from the evidence that appellant's acts were "planned in advance," then it "may conclude that his acts toward her were not the product of an irresistible impulse."

Appellant contends that the trial court erred in overruling objections to a statement by the Commonwealth that, if the jury found appellant not guilty by reason of insanity, he would go free. We find that the trial court properly cured what was plainly an error by the Commonwealth with an instruction.

In its closing argument, the Commonwealth told the jury that "the law, in the form of an insanity defense, says you may go free and a jury may find you not guilty if you find — if you can respond to an irresistible impulse." Counsel for appellant objected that "the Commonwealth's Attorney full well knows that's not the case and if this

man is found not guilty by reason of insanity he's committed to the Department of Mental Health." The Commonwealth countered that this assertion by appellant's counsel was "not true." The court advised both counsel that the matter would be left "to the instructions." In the presence of the jury, appellant's counsel answered that he was "going to ask for another instruction" as "the jury should know what happens if he's found not guilty by reason of insanity. He does not walk free."

Before presenting his closing argument to the jury, appellant's counsel moved "that the jury be instructed as to what happens to the defendant with regard to what happens if he's found not guilty." The court answered that it would "instruct this jury on that very question" but asked counsel to proceed with his argument. Appellant's counsel then informed the jury that a "finding of not guilty by reason of insanity will afford this community just as much protection" as a guilty verdict.

Following the closing arguments, the court instructed the jury as follows:

> [Y]ou should not concern yourselves with what happens after your verdict, whatever it is, so you need to confine yourself to the evidence as presented, follow the instructions and come up with your verdict and not concern yourselves with what might happen after the verdict is rendered. That's for the court to take up after your verdict.

We hold that, under the circumstances of this case, this instruction by the court to the jury properly cured a plainly improper remark by the Commonwealth.

■ It is well-established in Virginia that a jury is not to concern itself with post-sentencing events. *See Poyner v. Commonwealth*, 229 Va. 401, 432, 329 S.E.2d 815, 836, *cert. denied*, 474 U.S. 865 (1985). Thus, the trial court's admonishment to the jury not to take into consideration post-sentencing events correctly stated the law.

> The effect of improper remarks . . . is presumed to be curable by an admonishment to the jury. . . . When the trial court has taken such corrective action, a mistrial should not be declared unless there is a manifest probability that such action will not remove the prejudicial effects of improper remarks.

*Stotler v. Commonwealth*, 2 Va. App. 481, 484-85, 346 S.E.2d 39, 41 (1986) (citations omitted).

■ The appellant contends that the facts of this case must be construed in the light most favorable to him. According to his argument, once he has established that an error has occurred, it is up to the Commonwealth to prove that the error was not prejudicial. In order to know whether the error prejudiced appellant's interests, he contends this Court must review the evidence in the light most favorable to him. While it is true that generally we must consider an error prejudicial unless " 'it plainly appears from the record and the evidence' that the verdict was not affected by the error," if a trial court promptly instructs a jury to disregard the effect of an error, we may assume that the jury did so, unless the record " 'suggests a manifest probability' that it did not." *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1008-09, 407 S.E.2d 910, 912 (1991) (en banc) (quoting *Boykins v. Commonwealth*, 210 Va. 309, 313, 170 S.E.2d 771, 774 (1969)). We find nothing in the record to undermine this presumption.

Appellant further argues that the trial court erred in granting an instruction to the jury that, if it found appellant's acts were planned in advance, it could conclude they had not resulted from an irresistible impulse. According to appellant, this instruction encouraged the jury to reject the testimony of appellant's expert witness and constituted a comment on the evidence by the court. We disagree.

Appellant argues that, by giving the "planned-in-advance" instruction, the trial court effectively took from the jury the question whether to believe Dr. Brown's testimony that an irresistible impulse need not be fleeting but "may last from minutes to hours." The full text of the disputed instruction follows:

> If you find from the evidence that the acts of JEFFREY THEODORE KITZE toward [the victim] were planned in advance, you may conclude that his acts toward her were not the product of an irresistible impulse.

■ In *Thompson v. Commonwealth*, 193 Va. 704, 70 S.E.2d 284 (1952), the Supreme Court of Virginia stated that "[t]he irresistible impulse doctrine is applicable only to that class of cases where the accused is able to understand the nature and consequences of his act

and knows it is wrong, but his mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Id.* at 718, 70 S.E.2d at 292. In *Rollins v. Commonwealth*, 207 Va. 575, 151 S.E.2d 622 (1966), *cert. denied*, 386 U.S. 1026 (1967), the Court approved the following instruction: "[T]he jury is instructed that if the act which is alleged to be the result of an irresistible impulse was planned in advance, then, as a matter of law, such act cannot be said to be the product of an irresistible impulse." *Id.* at 580, 151 S.E.2d at 625.

The Court in *Rollins* noted that there was before it "no suggestion in the evidence that the defendant acted on an irresistible impulse." *Id.* Thus, the point decided by the Court was not actually in issue. *See Virginia Ry. & Power Co. v. Dressler*, 132 Va. 342, 350-51, 111 S.E. 243, 245-46 (1922). Nonetheless, the Court's approval of the instruction in *Rollins* directs our decision here.

The instruction approved in *Rollins* flows logically from the definition of "irresistible impulse" approved in *Thompson*, yet it extended that definition in a significant way. In approving the contested instruction, the Court in *Rollins* expressly relied on a dictionary definition of "impulse": "The word "impulse' implies that which is sudden, spontaneous, *unpremeditated.*" 207 Va. at 580, 151 S.E.2d at 625 (citing Webster's Third New International Dictionary 1138) (emphasis added). The Court thus approved an interpretation of the phrase "irresistible impulse" that precluded premeditated acts, or acts planned in advance, from being considered products of an irresistible impulse.

We note that, at least hypothetically, *Rollins* might be read too broadly to preclude an irresistible impulse defense in cases where there is evidence of advance planning but also evidence of an intent to abandon the plan. Where an individual plans a crime, yet subsequently exhibits a clear intent to abandon his plan, later perpetration of that same crime by that same individual might yet be the product of an irresistible impulse.

However, we find in this case no evidence that, once he had turned his car around and headed back to the house, defendant ever abandoned his criminal progress. This lack of evidence, coupled with the recognition by defendant's own expert that defendant was not in the grip of an irresistible impulse when he turned his car around and started back, leads us to conclude that, legally, there was no break between

the stage at which defendant planned his crimes and the stage at which he acted on those plans.

Although the instruction at issue here might not in all cases survive a challenge, there was, on the facts of this case, no error. Therefore, we follow the guidance of the Supreme Court in *Rollins* in holding that the trial court did not err in approving the instruction at issue.

Appellant asserts that the Commonwealth should not have been allowed to question Dr. Brown about a letter from an attorney, Michael DiPrima. We do not agree.

Dr. Brown testified that he wrote DiPrima and enclosed with his letter "a signed permission, a release from the defendant to release this information." In response, DiPrima sent the letter now contested on appeal.

One basis for the objection to the letter's introduction was that its authenticity had not been established. One non-statutory way to authenticate a document is through circumstantial evidence. " 'The court must determine if the circumstantial evidence is sufficient to justify the document's admission; the jury will then, as in all cases, make an independent decision as to whether the document is genuine.' " *Duncan v. Commonwealth*, 2 Va. App. 717, 726-27, 347 S.E.2d 539, 544 (1986) (quoting Charles E. Friend, *The Law of Evidence in Virginia* § 180, at 469 (2d ed. 1983)).

The fact that Dr. Brown received a letter from DiPrima in response to his inquiry may, if the court so deems it, be considered sufficient evidence to justify the document's admission. *See* Charles E. Friend, *The Law of Evidence in Virginia* § 180, at 469 (3d ed. 1988). Further evidence supporting the trial court's decision to admit the letter was undisputed. When the trial court asked appellant's counsel if he contested Dr. Brown's statement that appellant signed a consent form for the release of information from DiPrima, appellant's counsel answered that he did not. Considering the evidence that appellant signed the release form, that Dr. Brown wrote DiPrima a letter and included the release form, and that Dr. Brown received a letter from DiPrima in return, we cannot conclude that the trial court abused its discretion when it deemed the circumstantial evidence sufficient to justify the letter's admission.

Counsel for appellant and the Commonwealth argued the question of the letter's admissibility outside the presence of the jury. At one

point, counsel for appellant took the position that, if Dr. Brown indicated the letter was "part of the reason [he] reached the conclusion [he] did in this case," then appellant would have no objection to the letter's admission. However, appellant argued, "That is not what Dr. Brown said."

We disagree with this characterization of Dr. Brown's testimony. At two points Dr. Brown plainly indicated that he had relied on DiPrima's letter in making his evaluation. When asked if he had "utilize[d]" the letter in the conduct of his evaluation," Dr. Brown answered, "Yes." Asked if he had "receive[d]" the letter in the process of his evaluation and "consider[ed]" it in evaluation, Dr. Brown answered, "Yes."

Appellant conceded at trial that, if Dr. Brown relied on the letter in making his evaluation, the letter was admissible. Whether this resolution of the issue reflects the law in Virginia is not a question before us, for it is the law of this case.[1]

We disagree with the contention that Dr. Brown did not rely on the letter. The trial court did not err in admitting it.

For the foregoing reasons, the judgments of the trial court are affirmed.

*Affirmed.*

Baker, J., and Barrow, J., concurred.

---

[1] See *Buchanan v. Commonwealth*, 238 Va. 389, 416, 384 S.E.2d 757, 773 (1989), *cert. denied*, 493 U.S. 1063 (1990) which holds that Code § 8.01-401.1, which makes such information admissible, applies only to civil cases.