COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, AtLee and Senior Judge Clements
Argued at Fredericksburg, Virginia

UNPUBLISHED

DOUGLAS VERNON JOHNSON, JR.

v.     Record No. 1279-20-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE JEAN HARRISON CLEMENTS
MAY 17, 2022

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
James P. Fisher, Judge

Edward J. Ungvarsky (Ungvarsky Law, PLLC, on briefs), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a six-day trial, a jury convicted appellant of two counts of attempted capital

murder of a law enforcement officer, two counts of malicious wounding, four counts of use of a

firearm in the commission of a felony, and three counts of maliciously discharging a firearm in an

occupied dwelling. The trial court imposed the jury's recommended sentence of seventy-four years

of incarceration. On appeal, appellant raises the following assignments of error:

> I. The trial court erred in excluding expert testimony of Dr. Stephen
> Lally that Johnson understood the nature of his act and that it was
> wrong but that his mind was so impaired by Depression and PTSD
> that he acted under the influence of an irresistible impulse when he
> acted to grab and fire his gun.
>
> II. The trial court erred in excluding the testimony of Lateefah
> Johnson on relevancy grounds about her interaction with him five
> months earlier when she had to prevent him from shooting himself
> in a hotel.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

III. The trial court violated Johnson's rights to a public trial under the First, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 8 & 11 of the Virginia Constitution.

For the following reasons, we affirm the trial court's judgment.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

A. The Evidence at Trial

In December 2017, appellant lived in a two-story home with his ex-wife, Lateefah Johnson. Around 4:00 p.m. on December 24, their nineteen-year-old daughter, A.J., called 911 to report that appellant had assaulted her. A.J. told the 911 operator that appellant had "major depression" and was "an alcoholic," although she did not know whether he had consumed alcohol that day. A.J. also reported that there were at least two firearms in the home, but she did not know their locations. Two minutes later, appellant called 911 and requested A.J.'s removal from the home. Appellant reported that A.J. had pushed him and he "didn't touch" her. He acknowledged that he had consumed "a beer" and there were "three handguns" and "one rifle" in his "office" and "bedroom closet." Appellant said the firearms were unloaded and promised he would "not be touching them."

- 2 -

Loudoun County Sheriff's Deputies Katherine Fischer, Timothy Iversen, and Justin Nyce arrived at the residence in response to the 911 calls.[1]  Deputy Iversen found A.J. "crying and breathing heavily" and saw that the back of her jacket was ripped.  A.J. told Deputies Iversen and Nyce that appellant had broken her eyeglasses but was uncertain whether he had done it "intentionally or by accident."  Before police arrived, appellant had locked A.J. in the basement and become incensed when she returned upstairs.  A.J. described how appellant tried to seize her cell phone as she called her mother for help, at one point "push[ing] [A.J.] up against a brick wall" and placing his hand "around her neck."  Later, while hiding in a basement utility closet, A.J. sent text messages to a friend stating that she "had removed a magazine from one of the guns in the office."

The deputies went to appellant's bedroom to arrest him for domestic assault.  When he learned that he was under arrest, appellant became "very, very angry," arguing with the deputies and yelling for A.J. and Johnson.  Appellant "move[d] to the threshold of the closet" while Deputy Nyce tried to calm him.  When appellant positioned himself "half in, half out" of the closet, Deputy Nyce "called for backup" because he "knew that [appellant] was starting to plan something."

Ignoring repeated commands to "step out" of the closet doorway, appellant "twisted to his left" and "dove into the closet" as Deputy Fischer advanced to handcuff him.  Deputy Fischer heard gunshots as she jumped on appellant and felt "excruciating pain in [her] leg."  Deputy Fischer initially thought that appellant had "shot himself" because he was lying motionless on the floor.

---

[1] At trial, the Commonwealth introduced an audio recording from a microphone that was attached to Deputy Nyce's uniform during his investigation.  The Commonwealth also introduced video footage from a body worn camera that was attached to Deputy Iversen's uniform during the incident.

Deputy Iversen deployed his TASER as Deputy Fischer landed on appellant, firing two electrified prongs into appellant's abdomen.[2] Immediately recognizing that the prongs were too close together "to achieve neuromuscular incapacitation," Deputy Iversen tried to "make a follow-up third point of contact" with the TASER against appellant's body. As Deputy Iversen "dove" into the closet to apply the third point of contact, he heard "one gunshot," saw a flash of light, and collapsed on appellant.

Deputy Nyce followed Deputy Iversen into the closet and saw appellant holding a "two-toned 1911-style handgun." He disarmed appellant and placed the handgun in the closet's "back right corner." Deputy Nyce pinned appellant to the floor after applying a tourniquet to Deputy Fischer's leg, which was hemorrhaging blood from a gunshot wound. While pinned to the floor, appellant vacillated between "being irate and trying to get up" and "laying there and being calm"; at one point, he asked Deputy Nyce "to kill him."

Supporting deputies and emergency personnel arrived. Deputy Hao Lu found Deputies Iversen and Fischer lying on their backs while Deputy Nyce pinned appellant to the closet floor. Deputy Iversen was bleeding from gunshot wounds to his thighs and left forearm; Deputy Fischer was in the "initial stages of shock" from blood loss. Deputy Lu collected the .45-caliber 1911 handgun, unloaded the weapon, and placed it on a closet shelf while paramedics transported Deputies Iversen and Fischer to the hospital.

The same day, Deputy Andrew Mister executed a search warrant for the residence and photographed evidence he gathered. Deputy Mister diagramed the bedroom closet, where he discovered "blood on the floor and the wall," multiple loaded firearms, and ammunition. He collected three .45 caliber cartridge casings from the closet floor and the 1911 handgun from the

---

[2] At trial, Deputy Iversen testified that a TASER is a device used "to momentarily incapacitate a person" by "overrid[ing] the body's [electrical] signals in the peripheral nervous system."

- 4 -

closet shelf. A loaded magazine containing nine .45 caliber cartridges was next to the handgun. At trial, Virginia Department of Forensic Science Analyst Cara McCarthy, whom the trial court qualified as an expert in firearm and toolmark examination, testified that appellant's handgun required "approximately 5-1/2 pounds" of trigger pressure to fire.

Dr. Jeffrey Ho testified as an expert in the "fields of medicine, conducted electrical weapons, TASER, and the effects of conducted electrical weapons and TASER on the human body." Ho explained that a TASER's dual prongs must lodge at least twelve inches apart on the human body to achieve "the most minimal amount of [neuromuscular] incapacitation." He testified that a "follow-up third point of contact" is a method by which a TASER operator may still incapacitate a suspect despite a misplaced shot. The method entails pressing the TASER directly against a suspect in whom either only one prong has embedded or two prongs have embedded too closely.

Dr. Ho also testified regarding the "startle effect," a phenomenon in which the sudden, unexpected impact of a TASER prong may induce a suspect to "reflexively pull the trigger" of a firearm. Dr. Ho explained that the "third point of contact" method can cause a one-time "clinching of [a suspect's] fists," but not repeated contractions and release. Dr. Ho concluded that although it was "possible" that appellant experienced a startle effect from Deputy Iversen's TASER, it was unlikely that such an effect would cause appellant to pull the trigger repeatedly. Dr. Ho reached this conclusion because "the startle effect doesn't keep repeating itself" and is generally "a one-time event."

Appellant testified that he was employed as a Deputy Senior Operations Officer with "top secret security clearance" at an "intelligence organization." Appellant previously served fifteen years in the United States Army, including forty-two months of combat in Iraq, but he had struggled to "cop[e] with issues" stemming from his deployments. After witnessing many deaths, appellant

found returning home "very difficult," and he and Johnson divorced. Between 2006 and 2008, appellant's parents died, and he continued to struggle to adapt to civilian life. Appellant "reconciled" with Johnson in 2008 but returned to combat because "it just didn't feel normal at home." In August 2017, after four years of separation from his family, appellant moved into a residence with Johnson.

Appellant recounted his arguments with Johnson and A.J. and explained that, just before the altercations, he had consumed alcohol for "the first time in a couple months." When he learned that A.J. had removed the magazine from one of his handguns, he reloaded his firearms and concealed them in new locations, moving the handgun to a "cubby" on the floor of his bedroom closet. Appellant testified that he "always" kept the handgun "loaded" with "a round in the chamber" because it did not "go off" easily. Appellant claimed that he called 911 after arguing with A.J. to ensure that "the officers knew they weren't walking into some dangerous situation."

Appellant was "totally shocked" when the deputies came to arrest him. After realizing that he could not "reason with" them, he began contemplating suicide. Appellant "knew that getting arrested would impact [his] top-secret [security] clearance" and debated "whether to kill [himself] or ask . . . [to] walk to the car with no cuffs." Appellant admitted that he positioned himself near the closet so he could get his loaded handgun but claimed he intended to kill only himself. Appellant "always felt [he] was going to die" by suicide because he "had planned to do it in '07" and it "was just a matter of time." When he entered the closet's threshold, appellant "felt like [his] world was over" and his family "wasn't there for [him]."

Appellant explained that when Deputy Fischer approached, "I turned, I grabbed my weapon, I flicked off safety, and I remember getting a push or a hit or something" before falling to the floor. Appellant tried to brace himself with the handgun in his hand but "fell on the weapon" and "got tased" "as [his] stomach hit the ground." Appellant recalled convulsing from the TASER's shock,

hearing "two shots," and feeling "an explosion" before "everything went dark." Appellant "thought [he] was dead," but "things started to come back" when he heard the deputies' muffled orders to "drop the gun."

Appellant admitted that "it takes one bullet to kill someone" and that three bullets were fired. He denied ever shooting the firearm, however, claiming not to recall pulling the trigger or "feeling any kind of movement from the gun." He admitted that he was "very familiar" with the handgun's operation, having received military firearms training and fired the handgun "many times" before the incident. Moreover, appellant "touched [the handgun] almost every day" because it "made [him] calm down." Appellant claimed that he told police that he "didn't mean to hurt anybody" and the shooting "was an accident."

## B. The Commonwealth's Motion *in Limine*

Before trial, appellant filed notice of intent to introduce evidence of his insanity at the time of the offenses. Appellant's retained expert, Dr. Stephen Lally, evaluated his mental status at the time of the incident and produced a report detailing his findings and conclusions. The Commonwealth moved *in limine* to exclude Dr. Lally's report and testimony.

Dr. Lally found that appellant "began to actively research how to successfully commit suicide" in 2007. Appellant "delayed his decision to end his life when he returned to the [United] States [from combat] but reported that he bought his own weapon that he had planned to use and picked out a location." Appellant told Dr. Lally that he "had previously planned how to kill himself (a gunshot to the roof of his mouth)." Appellant claimed that when the police informed him that he was under arrest, he "ran through his plan and then stepped into the closet, grabbed the gun, flicked off the safety, and was trying to shoot himself when he was tackled." During a clinical interview, appellant reported that "he always has a plan on how he would commit suicide if he felt the need to do it." Dr. Lally's report concluded as follows:

In sum, it appears to a reasonable degree of psychological certainty that on the date of the offense, Mr. Johnson suffered from moderate to severe depression and PTSD, and that these conditions with the situational stressors . . . led him to attempt to take his life . . . . From Mr. Johnson's account, he appears to have an accurate perception of his actions (i.e., he was aware that he was attempting to end his life), but that his actions were directed from overwhelming emotions that arose from his mental disorder and as such his actions at that moment appear to be under the influence of an irresistible impulse.

At the hearing on the Commonwealth's motion *in limine*, appellant proffered that Dr. Lally had "diagnosed [appellant] with depression and PTSD" and his report "constitute[d] a proffer of the substance of the proposed evidence with respect to an insanity defense." Appellant argued that he had established "a *prima facie* case for . . . an insanity defense based upon irresistible impulse" and precluding Dr. Lally's testimony would effectively deprive him of his constitutional right to present a defense. The Commonwealth countered that Dr. Lally's opinion failed to "comport with the irresistible impulse doctrine" and, instead, constituted inadmissible evidence of appellant's "diminished capacity."

After argument by counsel, the trial court concluded that Dr. Lally's report "fail[ed] to set forth clinical findings and opinions consistent with Virginia law on the elements of an insanity defense" and constituted "nothing more than a catalog of speculative opinions amounting to little more than a diminished capacity defense." Accordingly, the court excluded Dr. Lally's expert report and testimony from trial.

C. Evidence of Appellant's Prior Suicidal Behavior

At trial, the Commonwealth moved the court to prohibit Johnson from testifying regarding appellant's alleged prior suicidal behavior. Defense counsel proffered that Johnson would testify about "an incident that occurred in July of 2017" when she was called to a hotel where appellant had "a gun and was suicidal." The Commonwealth conceded that Johnson could "testify as a fact witness about her perceptions of the events that occurred and [appellant's] demeanor" but asked the

court to prohibit Johnson from testifying about appellant's "mental state." Additionally, the Commonwealth asserted that the proffered testimony constituted impermissible character evidence of appellant's "propensity" to contemplate suicide. Appellant responded that the testimony was probative of his specific intent at the time of the offenses: "They [are] saying homicide; we are saying suicide."

The trial court determined that appellant sought to elicit "a specific prior instance of conduct" and "extrapolate from that, essentially a mental health-based defense" to negate *mens rea*. "Re-adopt[ing]" its previous ruling on the Commonwealth's motion *in limine*, the court concluded that "[t]here's no sliding scale of insanity" and evidence of "mental health issues" are inadmissible "absent some defense of insanity." Additionally, the trial court ruled that "prior specific instances are not admissible as a method of proving a character trait." Accordingly, the court sustained the Commonwealth's objection and excluded the proffered testimony.

## D. Sentencing

Following the guilt and punishment phases of the jury trial, the trial court scheduled a sentencing hearing for December 13, 2019. The court, however, granted two continuances: first because of a change in appellant's counsel, and second because of the COVID-19 pandemic. On June 9, 2020, the parties "requested a [third] continuance to allow public attendance at the hearing and trial." On September 10, 2020, however, the parties learned that the trial court had denied their continuance request and scheduled sentencing for September 30, 2020.

On September 11, 2020, appellant filed an "emergency motion" requesting a "contemporaneous in-courthouse livestream of hearing and sentencing." In his written motion, appellant asserted that the "COVID-19 pandemic and the resulting judicial emergency den[ied] him and the community the right to have public proceedings." Appellant cited to the Supreme Court's COVID-19 declaration of judicial emergency orders instructing circuit courts to

disfavor "in-person hearings" and "liberally" grant continuances due to the pandemic.[3]

Appellant acknowledged that the circuit court was "justifiably taking public health precautions," including "limiting attendance inside the building and enforcing social distancing." At a hearing on the motion, appellant argued that there was not "enough physically distanced space in the courtroom" to accommodate the "many" people who wished to attend appellant's sentencing hearing. The trial court denied appellant's request, concluding that it was "not going to continue [the case] any further. This is a year-old trial at this point."

At the sentencing hearing, appellant asked the court to revisit his motion for a continuance. Appellant argued that a further continuance was appropriate because COVID-19 protocols created "limitations on how many people [could] be in the courtroom," although he conceded that "[t]he deputies are doing a very fine job with that." Counsel continued, "My first request is that we continue the sentencing until a time that . . . all members of the public who wish to be present can be present" because "[w]e have at least nine other persons outside, family members who have come up from the Hampton area, coworkers who have come in from out of state." Alternatively, counsel asked the court to conduct the hearing in "the larger courtroom down the hall [to] allow more people to be able to attend today" than was feasible in the courtroom where the proceedings were occurring. Counsel added, "I have previously also asked . . . if there is a livestream capability."

_____

[3] On March 16, 2020, in response to the COVID-19 pandemic, the Supreme Court of Virginia declared a judicial emergency at the Governor's request. *See* Code § 17.1-330(A). That order directed courts to "[c]ontinue all . . . criminal matters, including jury trials, subject to a defendant's right to a speedy trial, with the exception of emergency matters." March 16, 2020, Order Declaring a Judicial Emergency in Response to COVID-19 Emergency, at 2. Trial courts were permitted to "exercise their discretion with regard to proceeding with ongoing jury trials, and in cases where the defendant is incarcerated." *Id.* Subsequent orders of March 27, 2020, April 22, 2020, May 6, 2020, June 1, 2020, and June 22, 2020, extended the original declaration of judicial emergency. The June 22, 2020 emergency order, although it extended some aspects of the original declaration of judicial emergency, permitted courts to "hear in-person non-emergency matters and non-jury cases if they determine it is safe to do so." June 22, 2020, Sixth Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency.

The trial court ruled, "[t]he motion for a continuance is denied and the motion to move the proceeding to a different courtroom is denied."

ANALYSIS

A. Dr. Lally's report and testimony were inadmissible.

Appellant contends that the trial court abused its discretion by excluding Dr. Lally's expert testimony regarding appellant's mental state at the time of the offenses. He argues that the court erroneously concluded that Dr. Lally's proffered testimony failed to establish *prima facie* evidence of appellant's insanity at the time of the offenses under the irresistible impulse doctrine. We disagree.

"It is well established that the admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." *Schmuhl v. Commonwealth*, 69 Va. App. 281, 299 (2018) (quoting *Patterson v. Commonwealth*, 3 Va. App. 1, 11 (1986)), *aff'd*, 298 Va. 131 (2019). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). "However, to the extent the trial court makes an error of law in the admission of evidence, 'an abuse of discretion occurs.'" *Id.* (quoting *Abney v. Commonwealth*, 51 Va. App. 337, 345 (2008)). "Furthermore, such evidentiary issues presenting a 'question of law' are 'reviewed *de novo* by this Court.'" *Id.*

"A criminal defendant is presumed to have been sane at the time of the commission of a criminal act." *White v. Commonwealth*, 272 Va. 619, 625 (2006) (citing *Stamper v. Commonwealth*, 228 Va. 707, 717 (1985)). "To present evidence of insanity to the fact finder, an accused must first make a *prima facie* showing that his evidence meets the requirements of the affirmative defense." *Morgan v. Commonwealth*, 50 Va. App. 120, 126 (2007) (citing *White*, 272 Va. at 629). "*Prima facie* evidence is '[e]vidence that will establish a fact or sustain a

- 11 -

judgment unless contradictory evidence is produced.'" *Id.* (quoting *White*, 272 Va. at 626). At the time of appellant's trial,[4] failure to make the required *prima facie* showing rendered the expert's testimony inadmissible because "evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, *irrelevant* to the issue of guilt." *Schmul*, 69 Va. App. at 300 (emphasis added) (quoting *Stamper*, 228 Va. at 717); *Johnson v. Commonwealth*, 70 Va. App. 45, 53 (2019) (same). In *Stamper*, the Supreme Court rejected the admissibility of expert testimony to prove a criminal defendant's "diminished capacity," observing that "[f]or the purposes of determining criminal responsibility a perpetrator is either legally insane or sane; there is no sliding scale of insanity." 228 Va. at 716, 717. The accused must prove "that his or her mental state met the appropriate legal definition of insanity '*at the time the offense was committed.*'" *Vann v. Commonwealth*, 35 Va. App. 304, 313 (2001) (quoting *Gibson v. Commonwealth*, 216 Va. 412, 417 (1975)).

"Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule and the irresistible impulse doctrine." *Id.* (quoting *Bennett v. Commonwealth*, 29 Va. App. 261, 277 (1999)). Relevant to appellant's argument, the "irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Id.*

"The word 'impulse' implies that which is sudden, spontaneous, unpremeditated." *Rollins v. Commonwealth*, 207 Va. 575, 580 (1966). "Acting on an impulse involves *no planning*; it could occur at any place in the presence of anyone." *Vann*, 35 Va. App. at 314

---

[4] After appellant's trial, the General Assembly enacted Code § 19.2-271.6 providing, in part, that evidence regarding a criminal defendant's "mental condition" at the time of the alleged offense, "including expert testimony," is "relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted as evidence if" it is otherwise admissible and "tends to show the defendant did not have the intent required for the offense charged." Code § 19.2-271.6(B); 2021 Va. Acts (Sp. Sess. I) chs. 523, 540.

(emphasis added) (citing *Rollins*, 207 Va. at 580; *Penn v. Commonwealth*, 210 Va. 213, 221 (1969)).  Thus, "[e]vidence that an accused planned his or her criminal acts precludes, as a matter of law, any finding that the accused acted under an irresistible impulse." *Bennett*, 29 Va. App. at 277 (citing *Rollins*, 207 Va. at 580).

Here, appellant stipulated that Dr. Lally's report "constitute[d] a proffer of the substance of the proposed evidence with respect to an insanity defense."  That report stated that appellant had previously "research[ed] how to successfully commit suicide," "purchased a firearm to shoot himself," and "*planned* where he would commit suicide."  (Emphasis added).  In addition, appellant admitted to Dr. Lally that he "always has a plan" for suicide and, at the time of the offenses, "ran through his plan" before entering the closet and retrieving the loaded handgun.  Thus, appellant's proffered evidence established that he acted in accordance with a premeditated plan—not an irresistible impulse—when he shot Deputies Fischer and Iversen.

Appellant's proffered evidence precluded "as a matter of law" any finding that he acted under an irresistible impulse.  *Bennett*, 29 Va. App. at 277 (citing *Rollins*, 207 Va. at 580).  Consequently, Dr. Lally's testimony regarding appellant's mental state at the time of the offenses was "irrelevant," and therefore inadmissible.  *Stamper*, 228 Va. at 717; *Schmul*, 69 Va. App. at 300.  Accordingly, the trial court did not abuse its discretion by excluding Dr. Lally's testimony at trial.

B.  Any error in excluding testimony of appellant's prior suicidal behavior was harmless.

Appellant contends that the trial court abused its discretion by excluding Johnson's proffered testimony that approximately five months before he shot the deputies, appellant "was in a hotel with a gun and was suicidal."  He argues that the trial court wrongly concluded that the testimony constituted inadmissible "diminished capacity" evidence and was irrelevant.  Appellant asserts that the "court's ruling deprived [him] of important corroborative evidence in

support of his defense" that he specifically intended to kill himself, not the deputies, and their shooting was accidental. We do not address appellant's arguments because any possible error in excluding the proffered testimony was harmless.

"This Court will not reverse a trial court for errors 'that were harmless to the ultimate result.'" *Lienau v. Commonwealth*, 69 Va. App. 254, 269 (2018) (quoting *Carter v. Commonwealth*, 293 Va. 537, 544 (2017)), *aff'd upon rehearing en banc*, 69 Va. App. 780 (2019). "It is 'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless' lest they 'retreat from their responsibility, becoming instead "impregnable citadels of technicality."'" *Id.* (quoting *Commonwealth v. White*, 293 Va. 411, 420 (2017)). "Under the harmless error doctrine, if there was 'a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.'" *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015) (quoting Code § 8.01-678). If "the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand." *Lienau*, 69 Va. App. at 270 (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)).

Under those principles, we have held that "[a]n error is harmless '[i]f other evidence of guilt is so overwhelming and the error insignificant, by comparison,'" that we can conclude that "'the error did not have a substantial effect on the verdict.'" *Hillman v. Commonwealth*, 68 Va. App. 585, 601 (2018) (quoting *Angel v. Commonwealth*, 281 Va. 248, 268 (2011)). Here, the Commonwealth's evidence overwhelmingly established that appellant specifically intended to shoot and kill Deputies Iversen and Fischer.

"To premeditate means to adopt a specific intent to kill." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)); *see also* Code § 18.2-31(6). "The intention to kill need not exist for any specified length of time

- 14 -

prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington*, 262 Va. at 352). "[I]t is necessary that the [attempted] killing should have been done on purpose, and not by accident, or without design." *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982)).

Applying those principles, the Supreme Court has repeatedly affirmed findings of premeditation when a defendant shot the victim at close range without provocation. *See, e.g.*, *Schmitt v. Commonwealth*, 262 Va. 127, 143 (2001); *Stewart v. Commonwealth*, 245 Va. 222, 240-41 (1993). Moreover, we have held that "[t]aking the steps necessary to locate and obtain a weapon further bolsters the inference of malice," *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994), and a fact finder is entitled to infer a defendant's guilt from his affirmative acts of falsehood and "related conduct," *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992). In this case, the evidence established that appellant shot Deputy Iversen twice and Deputy Fischer once at close range without provocation. *Cf. Schmitt*, 262 Va. at 143 (holding evidence proved premeditation where defendant shot unarmed bank teller twice at close range); *Stewart*, 245 Va. at 240-41 (holding evidence proved defendant premeditated wife's murder where he shot her twice at point-blank range).

Appellant also concealed multiple, loaded firearms in readily-accessible locations before the deputies arrived but falsely assured the 911 dispatcher that his firearms were not loaded and he would not touch them. From these circumstances, a jury reasonably could conclude that appellant premeditated shooting the deputies and deliberately attempted to create a false sense of security for them so that they would be unprepared to neutralize his violent intentions. *See Morris*, 17 Va. App. at 578; *Palmer*, 14 Va. App. at 348-49. Furthermore, appellant's candid

- 15 -

admission that he "knew that getting arrested would impact [his] top-secret [security] clearance" provided a compelling motive to kill the deputies. *See Aldridge*, 44 Va. App. at 656 (although "motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent" (quoting *Epperly*, 224 Va. at 232)).

In addition, the Commonwealth's scientific evidence negated appellant's claim that the shooting was an accidental consequence of the "startle effect" he may have experienced from Deputy Iversen's TASER. Forensic testing established that "approximately 5-1/2 pounds" of pressure was necessary to fire appellant's handgun. Indeed, appellant readily agreed that his weapon did not "go off" easily. Moreover, Dr. Ho testified that although it was "possible" appellant experienced a "startle effect" from Deputy Iversen's TASER, it was unlikely that appellant experienced *repeated* startle effects because the phenomenon "doesn't keep repeating itself"; rather it is generally "a one-time event." The rational inference from that testimony was that appellant did not accidentally fire three shots; instead he purposely and repeatedly fired his weapon with the intent to kill the deputies. Thus, the jury could judge appellant's explanation that the shooting was accidental as false and evidence that he was lying to conceal his guilt. *See Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998) (observing that the fact finder is "entitled to disbelieve" appellant's "self-serving testimony" and to "conclude that [he] was lying to conceal his guilt"); s*ee also Ervin v. Commonwealth*, 57 Va. App. 495, 519-21 (2011) (holding that a fact finder may properly reject a defendant's hypothesis of innocence).

In sum, the "combined force" of the above circumstances established overwhelming evidence of appellant's guilt. *See Massie v. Commonwealth*, 74 Va. App. 309, 323 (2022) (recognizing that "the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion" (quoting *Pick v. Commonwealth*, 72 Va. App. 651, 668 (2021))). Accordingly, we conclude that any possible error

in excluding the proffered testimony of an unrelated incident that occurred approximately five months before the shooting did not have a "substantial effect" on the jury's verdicts and was, therefore, harmless. *Cf. Clay v. Commonwealth*, 33 Va. App. 96, 110-13 (2000) (holding trial court's erroneous exclusion of corroborative testimony harmless where proof that defendant angrily shot wife twice with firearm requiring over three pounds of trigger pressure negated defense theory of accidental shooting), *aff'd*, 262 Va. 253 (2001).

C. Appellant has not established a deprivation of his constitutional right to a public trial.

Finally, appellant contends that the trial court erred by limiting the availability of spectator seating during his sentencing hearing and effectively closing the proceedings to the public. Relying upon the United States Supreme Court's decision in *Presley v. Georgia*, 558 U.S. 209 (2010), appellant asserts that by failing to make adequate factual findings supporting the alleged closure, the trial court violated his constitutional right to a public trial under the Sixth Amendment of the United States Constitution and Article I, Section 8 of the Virginia Constitution. We disagree.

Constitutional arguments present questions of law that we review *de novo*. *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020) (quoting *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005)). "The right of one accused of a crime to receive a public trial is secured by the constitutions of the United States and Virginia." *Vescuso v. Commonwealth*, 5 Va. App. 59, 64, (1987) (*en banc*) (citing U.S. Const. amend. VI; Va. Const. art. I, § 8); *see also In re Oliver*, 333 U.S. 257, 273 (1948) (extending federal Sixth Amendment right of an accused to a public trial to the States through the Fourteenth Amendment). The "public courtroom setting is an essential part of the fundamental conception of justice." *Vescuso*, 5 Va. App. at 67. It is "not merely a method to assure that nothing untoward is done clandestinely but a guarantee against the very

conduct of private hearings." *Id.* (citing *Rovinsky v. McKaskle*, 722 F.2d 197, 202 (5th Cir. 1984)).

Nevertheless, the right to a public trial is not absolute and "may give way in certain cases to other rights or interests." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.* Thus, before a circuit court may close a criminal trial to the public, the party moving for closure "must advance an overriding interest that is likely to be prejudiced." *Id.* at 48. *Accord Vescuso*, 5 Va. App. at 68. The burden is upon the defendant to prove by a preponderance of the evidence that the trial court infringed upon the right to public trial in the first instance (*i.e.*, that the trial court "closed" proceedings to the public). *Vescuso*, 5 Va. App. at 66. "[O]nce the *prima facie* case is made, the burden of going forward with the evidence shifts to the Commonwealth and it is incumbent upon it to produce evidence to justify" the closure.[5] *Id.* at 66-67 (citing C. Friend, *The Law of Evidence in Virginia* §§ 78-88 (2d ed. 1983)).

To meet the burden of establishing a *prima facie* showing of a closure, an appellant must identify "affirmative proof in the record" that the trial court denied the public "freedom of access" to his or her criminal trial. *Caudill v. Peyton*, 209 Va. 405, 408 (1968). Applying that test, the Supreme Court of Virginia has delineated general principles guiding our analysis of whether a trial was "closed" to the public. A criminal trial should be "a 'public trial' in the ordinary common-sense acceptation of the term." *Jones v. Peyton*, 208 Va. 378, 381 (1967). A public trial requires, at a minimum, that attendance "is not limited or restricted to any particular class of the community, but is open to the free observation of all." *Cumbee v. Commonwealth*,

_____

[5] The Sixth Amendment and Article I, Section 8 mandate that the closure "be no broader than necessary to protect" the asserted overriding interest. *Waller*, 467 U.S. at 48. *Accord Vescuso*, 5 Va. App. at 68. In addition, "the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48.

219 Va. 1132, 1135 (1979). Thus, an accused's right to a public trial "is not impaired where there is no record of purposeful exclusion of the general public by order of the court." *Spencer v. Commonwealth*, 240 Va. 78, 86-87 (1990) (citing *Flores v. State*, 475 P.2d 37, 39 (Alaska 1970). *Cf. Estes v. Texas*, 381 U.S. 532, 552 (1965) ("[a] public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process" (Harlan, J., concurring)).

Assuming without deciding that an accused's right to a public trial applies to a sentencing hearing, appellant failed to make a *prima facie* showing that the trial court denied him that right.[6] Appellant has not identified "affirmative proof in the record" demonstrating that the trial court excluded the public from the sentencing hearing. *Caudill*, 209 Va. at 408. The only evidence in the record of any potential exclusion of the public is defense counsel's cursory proffers to the trial court and requests for relief. At the sentencing hearing, appellant stated that "due to COVID-19, there are limitations on how many people can be in the courtroom" and appellant had "at least nine *other* persons outside," including family members and co-workers. (Emphasis added). Appellant then requested either a continuance or a transfer of the hearing to "the larger courtroom down the hall," which he asserted would "allow *more people* to be able to attend today than what is allowed in this courtroom." (Emphasis added).

No evidence in the record, however, reflects how many people were *already present* in the courtroom or how many seats were available. Appellant did not proffer or establish whether any members of the general public, appellant's family, or the media were present in the courtroom at sentencing. *Cf. Spencer*, 240 Va. at 86-87 (holding there was no closure where some members of

---

[6] The Commonwealth appears to concede in its brief that appellant's sentencing was at least "partially closed." At oral argument, however, the Commonwealth denied any such concession. Regardless, it is well-settled that "we are not bound by concessions of law by the parties." *Epps v. Commonwealth*, 47 Va. App. 687, 703 (2006) (citing *Tuggle v. Commonwealth*, 230 Va. 99, 111 n.5 (1985)).

the general public, media, and defendant's family attended defendant's trial). There is no suggestion in the record that the courtroom doors were locked. *See Jones*, 208 Va. at 379 (holding trial court's closed-door, *in camera* trial violated defendant's right to public trial); *cf. Caudill*, 209 Va. at 408 (holding trial court's open-door, *in camera* trial did not violate defendant's right to public trial). Also conspicuously absent from the record is any evidence that the trial court "limited or restricted" access to appellant's sentencing "to any particular class of the community." *Cf. Cumbee*, 219 Va. at 1135 (holding the trial court denied defendant a public trial by issuing a blanket order excluding all of the defendant's family and friends, members of the media, and the general public). Although appellant cites the Supreme Court's judicial emergency orders addressing the COVID-19 pandemic as a circumstance suggestive of a closure, appellant has identified nothing in those orders restricting the public's freedom of access to criminal trials. As noted above, the Supreme Court's June 22, 2020 order permitted courts to resume "in-person non-emergency matters and non-jury cases" if they determined it was "safe to do so." June 22, 2020, Sixth Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency. A lack of adequate seating capacity, standing alone, does not establish a "purposeful exclusion of the general public by order of the court." *Spencer*, 240 Va. at 86-87 (citing *Flores*, 475 P.2d at 39); *cf. Estes*, 381 U.S. at 552 (Harlan, J., concurring).

From appellant's limited proffer, this Court may only speculate regarding the basic surroundings and circumstances of the sentencing proceedings. *Cf. Tynes v. Commonwealth*, 49 Va. App. 17, 24 (2006) (holding that defendant failed to make an adequate proffer to support assertion that the trial court erred); *see also Smith v. Commonwealth*, 16 Va. App. 630, 635 (1993) (observing that an appellant bears the burden to present a sufficient record from which a reviewing court can determine whether the lower court has erred). Thus, given the lack of any affirmative evidence in the record that the trial court restricted the public's freedom of access to appellant's

sentencing hearing, we cannot conclude that appellant has made a *prima facie* showing that he was deprived of the right to a public trial.[7]

Finally, we conclude that appellant's reliance upon the United States Supreme Court's decision in *Presley* is misplaced. There, the trial court expressly ordered the defendant's uncle to leave the courtroom during jury selection. *Presley*, 558 U.S. at 210. Responding to the defendant's objection to the court's exclusion of the general public from *voir dire*, the trial court explained, "[t]here just isn't space for them to sit in the audience." *Id.* At a post-conviction hearing, the defendant "presented evidence showing that 14 prospective jurors could have fit in the jury box and the remaining 28 could have fit entirely on one side of the courtroom, leaving adequate room for the public." *Id.* at 210-11. The Supreme Court overturned the defendant's conviction, concluding that the Sixth Amendment public trial right attached to *voir dire* proceedings and the trial court violated that right by failing to make adequate factual findings under *Waller* to support the closure. *Id.* at 212-13.

*Presley* is distinguished on its facts. In *Presley*, the trial judge explicitly ordered the public, including the defendant's uncle, from the courtroom and the defendant presented affirmative evidence proving that the courtroom could have accommodated the public's presence during jury selection. *Id.* at 210-11. Here, there was no such evidence of exclusion. Thus,

---

[7] In his written emergency motion for continuance, appellant referenced the circuit court's published security protocols that potentially restricted public access to the courthouse during his sentencing hearing. Under settled principles of appellate review, however, we cannot consider evidence that the appellant "failed to submit to the trial court." *John v. Im*, 263 Va. 315, 320 (2002); Rule 5A:10. Appellant's pleadings are not evidence and he failed to introduce any evidence regarding such restrictions, despite the opportunity to do so. *Cf. John*, 263 Va. at 320 (declining to consider on appeal scientific articles the defendant did not introduce as a trial exhibit); *see also Albert v. Albert*, 38 Va. App. 284, 291 n.2 (2002) (holding child support worksheets were not part of appellate record because they were not introduced into evidence at the support hearing); *Boyd v. County of Henrico*, 42 Va. App. 495, 505 (2004) (holding that opposing counsel's statements referenced in appellate brief were not part of evidentiary record on appeal where they were not reflected in the trial transcript).

rather than supporting appellant's argument, *Presley* underscores the necessity for the defendant to present *prima facie* evidence of a closure and an adequate factual record for a reviewing court to ascertain whether error occurred. *Vescuso*, 5 Va. App. at 66; *see also Smith*, 16 Va. App. at 635.

In sum, we conclude that appellant failed to make a *prima facie* showing that the trial court "closed" his sentencing hearing to the public. Accordingly, we cannot conclude that the trial court violated appellant's right to a public trial guaranteed under the Sixth Amendment of the federal constitution and Article I, Section 8 of the Virginia Constitution.[8]

CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

*Affirmed*.

---

[8] Although appellant's assignment of error also asserted violations of his rights under the First Amendment and Article I, Sections 1 and 11 of the Virginia Constitution, he advanced no separate argument in support of his contention. Thus, he has waived those issues. "[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Sneed v. Bd. of Prof'l Responsibility of the Supreme Court of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). *See also Lawlor v. Commonwealth*, 285 Va. 187, 211 (2013) (declining to consider assignments of error which were "not independently argued on brief"). Accordingly, Rule 5A:20 forecloses our review. *Cf. Fadness v. Fadness*, 52 Va. App. 833, 851 (2008) (holding that when a party's failure to comply with Rule 5A:20 is "significant, they have waived their right to have these issues reviewed by this Court").